**UNITED STATES of America,**

v.

**Samad HAQQ, Defendant.**

**No. 00 Cr. 278(NRB).**

United States District Court, S.D. New York.

July 31, 2002.

As Corrected Aug. 15, 2002.

---

William F. Johnson, Christine H. Chung, Assistant United States Attorneys, Southern District of New York, New York City, Counsel for the United States.

Steven M. Statsinger, Cary Bricker, Legal Aid Society Federal Defender Division, New York City, Counsel for Defendant.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Defendant Samad Haqq was indicted for firearms possession. Following three evidentiary hearings, we granted defendant's motion to "suppress the physical evidence seized and statements made by him at the time of his arrest on February 9, 2000." Transcript of Proceedings held on December 18, 2000 ("12/18 Tr."), at 2. The Government appealed one aspect of this decision[1] and, on January 17, 2002, the United

---

**1.** The Government did not appeal our factual finding that, contrary to the arresting officer's testimony, an outline of a gun was not visible through the suitcase, with the legal consequence that the gun was not in "plain view."

States Court of Appeals for the Second Circuit vacated the suppression order and remanded the case to this Court "for consideration of the issue of defendant's expectation of privacy in the suitcase" in which the firearms were found. *United States v. Haqq*, 278 F.3d 44, 45. We now find that Mr. Haqq had a reasonable expectation of privacy in the suitcase and, accordingly, reinstate the suppression order.

## BACKGROUND

At all relevant times, Mr. Haqq lived a small two-bedroom apartment in the Bronx rented by his fiancee, Francine Harris (the "apartment"). Ms. Harris's six year old son, Cedric, also lived in the apartment, as did Reginald Peavy, a friend of Ms. Harris, who subleased one of the bedrooms. On February 9, 2000, New York City Police officers went to Ms. Harris's apartment to arrest Mr. Haqq. Upon arrival, the officers handcuffed Mr. Haqq and another person present in the apartment, Samuel Myers, and placed them in custody in the living room. The officers then conducted a "protective sweep" of the apartment. Transcript of Suppression Hearing held on September 19, 2000 ("9/19 Tr."), at 24–25. In the course of this sweep, Detective Ralph Hanna entered a bedroom and observed a closed black nylon suitcase on the bed (the "suitcase"). *Id.* at 26. Det. Hanna testified that the outline of a handgun was visible through the material of the suitcase.[2] *Id.* at 26–27. He then touched the surface of the suitcase, unzipped it, and removed three handguns. *Id.* at 29–31. Mr. Haqq subse-

quently gave a statement to the officers and consented to a search of the apartment, which yielded two additional handguns.

■ It is well-settled that a criminal defendant seeking to exclude evidence on the ground that it was seized in violation of the Fourth Amendment "must demonstrate that he *personally* [had] an expectation of privacy in the place searched, and that his expectation [was] reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (emphasis supplied). In our previous decision, we found that Mr. Haqq's "reasonable expectation of privacy *in his home*" was sufficient to meet this test and, accordingly, we granted his suppression motion.[3] 12/18 Tr. at 6 (emphasis supplied). On remand, however, we have been directed to determine whether Mr. Haqq had the required "reasonable expectation of privacy" *in the suitcase itself*, rather than the apartment. *Haqq*, 278 F.3d at 48. As explained below, we find that he did indeed have such an expectation.

## DISCUSSION

■ For purposes of the Fourth Amendment, an expectation of privacy is "reasonable" if it emanates from "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The Government argues that this test requires a defendant to prove an "exclusive posses-

---

**2.** We did not find this testimony to be credible. *See* 12/18 Tr. at 7–10. Indeed, after several failed attempts, the only way the Government was able to make the gun visible through the fabric of the suitcase was to stuff the suitcase with cardboard boxes that no one claimed were actually in the suitcase at the time of the search. *See* 9/19 Tr. at 61–63.

**3.** We excluded the last two handguns found, as well as Mr. Haqq's statement as " 'fruit of the poisonous tree.' " 12/18 Tr. at 10 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963))

sory interest" in the place or item searched to establish standing. Gov. Mem. at 7–23. The Government's proposed test is not supported by a single case, and, indeed, ignores established Supreme Court and Second Circuit precedent.

Moreover, the Government's argument seriously misreads the Second Circuit's decision in this very case. On appeal, the Circuit wrote that "exclusive custody and control of an item within one's home is *sufficient* to establish a reasonable expectation of privacy in that item". *Haqq*, 278 F.3d at 51 (emphasis supplied) The Government construes this language from *Haqq* to mean that "absent 'exclusive custody and control' of the container, the defendant lacks standing." Gov. Mem. at 17. In light of the Second Circuit's use of the word "sufficient," however, this reading is nothing short of misleading. Furthermore, on the record before the Circuit panel, there was no dispute that Mr. Haqq lacked an "exclusive possessory interest" in the suitcase because he acknowledged that it belonged to Mr. Peavy, and that he had merely borrowed it.[4] *See, e.g.,* 11/6 Tr. at 20–23; Letter from Cary A. Bricker dated October 17, 2000, at 5 n. 1. Therefore, if the Government's statement of the law—that suppression is only available if Mr. Haqq held an "exclusive possessory interest" in the suitcase—were correct, the Circuit panel would have simply reversed, rather than remanding.

In any event, the Government cites *United States v. Zapata–Tamallo,* 833 F.2d 25, 27 (2d Cir.1987) in support of its misreading of Circuit precedent. Gov. Mem. at 16. In that case, Mr. Zapata–Tamallo argued that the district court had erred by denying his motion to suppress several kilograms of cocaine that had been found by police in a "blue nylon bag" that officers had observed being passed to Mr. Zapata–Tamallo from "an unidentified person" just moments before they engaged in the challenged search. *Id.* at 26–27. The search took place in an apartment whose owner voluntarily consented to the search. *Id.* at 26–27. Mr. Zapata–Tamallo was merely a guest in the apartment. *Id.* at 26.

In *Zapata–Tamallo,* the Second Circuit stated that "Zapata has offered no proof that he had a legitimate expectation of privacy in the bag." *Id.* at 27 (upholding the district court's decision). The *Zapata–Tamallo* Court then went on to observe, in dicta, two ways in which Mr. Zapata–Tamallo could have, but did not, establish the required reasonable expectation of privacy in the bag. The Court stated that "there was no evidence that Zapata had an exclusive possessory interest in the bag," nor had the defendant proved "that the bag was 'obviously' his." *Id.; see generally United States v. Isom,* 588 F.2d 858, 861 (2d Cir.1978) ("a third party's consent to a search is generally invalid when it is 'obvious' that the searched item belongs to a guest"). This dicta did not, as the Government argues, announce a new rule of Constitutional law that the *only* way for a defendant to show that he held a "reasonable expectation of privacy" in a given piece of property is to prove that he held an "exclusive possessory interest" therein. Gov. Mem. at 16. Rather, the *Zapata–Tamallo* Court was merely offering two examples of the myriad ways in which a defendant can succeed in establishing Fourth Amendment standing.

■ This reading of *Zapata–Tamallo* is buttressed by the Supreme Court's clear rejection of the Government's argument:

> [While o]ne of the main rights attaching to property is the right to exclude oth-

---

4. In addition, there is no dispute that the suitcase contained personal items belonging both to Mr. Myers and Mr. Haqq. *See, e.g.,* 11/6 Tr. at 8.

ers, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude[, e]xpectations of privacy protected by the Fourth Amendment ... need *not* be based on a common-law interest in real or personal property, or on the invasion of such an interest.

*Rakas,* 439 U.S. at 143 n. 12, 99 S.Ct. 421 (emphasis supplied); *see also id.* at 143, 99 S.Ct. 421 ("arcane distinctions developed in property and tort law ... ought not to control" the Fourth Amendment standing analysis, which properly "depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place").[5] Therefore, while an "exclusive possessory interest" is *sufficient* to demonstrate a "reasonable expectation of privacy," it is by no means the *sine qua*

*non* of Fourth Amendment standing. *Cf. United States v. Rahme,* 813 F.2d 31, 33 (2d Cir.1987) (while ownership, possession, and the right to exclude others are all factors to be considered in deciding whether a defendant had a "legitimate expectation of privacy in a searched place or item," none are dispositive); *United States v. Haydel,* 649 F.2d 1152, 1154 (5th Cir. 1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982) ("No one circumstance is talismanic to the *Rakas* inquiry.").[6]

Thus, under the correct legal standard, we look to the "totality of the circumstances" to determine whether Mr. Haqq possessed a "reasonable expectation of privacy" in the suitcase. *Haqq,* 278 F.3d at 51 (remanding this case for "consideration of whether Haqq had a reasonable expectation of privacy in the suitcase"); *see Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (ap-

---

**5.** Furthermore, the Supreme Court has specifically held that overnight guests, who, by definition, do not have an "exclusive possessory interest" in their hosts' quarters, have a reasonable expectation of privacy sufficient to merit Fourth Amendment protection against warrantless searches of those quarters. *Minnesota v. Olson,* 495 U.S. 91, 96–97, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *see also Bumper v. North Carolina,* 391 U.S. 543, 548 n. 11, 88 S.Ct. 1788, 20 L.Ed.2d 797 (recognizing petitioner's standing to challenge a search where the item at issue "was used by all members of the household and was found in the common part of the house").

**6.** In addition, we note that the Government's brief includes an extended attack on Judge Meskill's concurring opinion, stating, for example, that "Judge Meskill's proposals lack any basis in the law and indeed conflict with longstanding precedents, including Supreme Court precedents [and] also are manifestly in tension with the majority opinion." Gov. Mem. at 11–12. It would seem that the Government failed to read the majority opinion with sufficient care. *Compare id.* at 12 ("Judge Meskill's views were not shared by the majority") *with Haqq,* 278 F.3d at 51

("the determination of whether Haqq had a reasonable expectation of privacy in the suitcase [should properly include the considerations] discussed by Judge Meskill"). Furthermore, while the Government might not have found a case that directly supports Judge Meskill's concurrence, his proposal to create a "presumption that a resident has a reasonable expectation of privacy in all things within his home not within plain view," *Haqq,* 278 F.3d at 52 (Meskill, J., concurring), would not turn Supreme Court precedent "on its head," as postulated by the Government. Gov. Mem. at 12. To the contrary, a defining theme of Supreme Court precedent is that the protections granted by the Fourth Amendment are "most heightened" in a "private home." *Dow Chem. Co. v. United States,* 476 U.S. 227, 237 n. 4, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986); *see also, e.g., Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961) ("[a]t the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion").

proving of the Supreme Court of Kentucky's use of the "totality of the circumstances" test); *Haydel,* 649 F.2d at 1155 (applying "totality of the circumstances" test). On this question, we are mindful of the Supreme Court's observation that "luggage is a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy." *Arkansas v. Sanders,* 442 U.S. 753, 762, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (dicta), *overruled on other grounds by California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).

■ First and foremost, while Mr. Peavy owned the suitcase, we find that Mr. Haqq had Mr. Peavy's permission to use it. Mr. Haqq testified that he and Mr. Peavy had a general agreement that each could use the other's belongings and that Mr. Peavy had given him specific permission to use the suitcase. Transcript of Hearing conducted on November 6, 2000 ("11/6 Tr."), at 5:20–23, 14:25; *see also* Declaration of Samad Haqq filed on October 17, 2000 ("Haqq Decl.") ¶ 4. Mr. Peavy's testimony, however, stands in stark contrast to that given by Mr. Haqq. Mr. Peavy testified that he and Mr. Haqq had no general arrangement regarding the use of each other's belongings and that, in particular, he did not give Mr. Haqq permission to use the suitcase. Transcript of Hearing conducted on November 21, 2000 ("11/21 Tr."), at 20:19–22, 19:20–22. *But cf. id.* at 43:22–44:2 (Mr. Peavy testifying that he "didn't say [that Mr. Haqq] couldn't use [the] suitcase").

Comparing the witnesses' manner and demeanor on the stand, we found Mr. Haqq to be more credible than Mr. Peavy. In addition, Mr. Haqq's testimony was specific and plausible. *See, e.g.,* 11/6 Tr. at 12–13 (Mr. Haqq testifying that he asked to use the suitcase because his own duffel bag had a hole in it, rendering it unusable); *id.* at 13 (Mr. Haqq testifying that he had previously borrowed a sweater from Mr. Peavy, and that Mr. Peavy had borrowed a coat from him). Moreover, several aspects of Mr. Peavy's testimony seriously undermined his credibility. For example, while Mr. Peavy admitted that he had been a crack addict for four or five years during his employment as a New York City corrections officer, *id.* at 21:9–10, 24:11–13, 26:8–9, 25:4–6, and that he smoked crack during the week and on weekends, *id.* at 25:1–3, sometimes up to four days a week, *id.* at 24:19–22, spending approximately $40 a day, *id.* at 26:2–3, he swore that he never used crack on the job, *id.* at 21:11–12, he was never under the influence at work, *id.* at 21:13–15, 25:7–11, and that he never arrived late to work because he had smoked crack the night before, *id.* at 25:12–14. We find that, given Mr. Peavy's admissions regarding his frequent crack use, his denials regarding its effect on his job performance are incredible and cast a doubt on all of his testimony.[7] Furthermore, Mr. Peavy acknowledged that smoking crack adversely affects one's memory, *id.* at 27:22–24, and that sometimes he could not remember conversations due to his crack use, *id.* at 27:25–28:2. Thus, his testimony that he did not give Mr. Haqq permission to use the suitcase is also unreliable because Mr. Peavy may simply have forgotten the conversation in which such permission was granted.[8] *See, e.g., id.* at

---

**7.** Mr. Peavy's crack use also led to another episode that undermines his credibility as a witness: When Mr. Peavy failed a random drug test while employed as a corrections officer, he engaged in an unsuccessful attempt to keep his job by lying to his superiors by telling them that he was an alcoholic, not a

crack addict. 11/22 Tr. at 34:23–35:1, 35:17–36:5, 37:5–13.

**8.** Notably, when Mr. Peavy was asked on direct examination if he had had a discussion with Mr. Haqq about "him being able to use your personal belongings and you being able

19:20–22. In short, for all the reasons just discussed, we conclude that Mr. Haqq did indeed have Mr. Peavy's permission to use the latter's suitcase.[9]

Thus, with permission of its owner, Mr. Haqq packed up his shoes and underwear in the suitcase, 11/6 Tr. at 7:5–7, and went on a two week road trip to the Carolinas with Mr. Myers. *Id.* at 7:3–4, 7:8–9. Mr. Myers also placed some of his own clothing in the suitcase. *Id.* at 14:16–20. When they returned on February 9, 2000, shortly before the challenged search, Mr. Haqq and Mr. Myers took loose items from the car, placed them in the suitcase, and brought the suitcase inside the apartment. *Id.* at 8:3–21. Mr. Haqq then instructed Mr. Myers to place the suitcase in Cedric Harris's room,[10] and Mr. Myers did so.[11] *Id.* at 8:22–9:1. Mr. Peavy was not present in the apartment when Mr. Haqq and Mr. Myers returned. *Id.* at 16:12–13. A short while later, police officers knocked on the door of the apartment, at which time Mr. Haqq told Mr. Myers to hide several handguns in the suitcase in Cedric's room, and Mr. Myers complied. 11/6 Tr. at 9:12–18.

Mr. Haqq's direction to Mr. Myers that the latter hide the handguns in the suitcase so the police would not find them clearly evidences his subjective expectation of privacy in the suitcase. Furthermore, this expectation was entirely reasonable, because our society recognizes such an expectation in a suitcase that one takes with him for a two-week trip, packs his belongings therein, and treats as his own, even if it is borrowed from a roommate. *See generally Sanders,* 442 U.S. at 762, 99 S.Ct. 2586 ("luggage is . . . inevitably associated with the expectation of privacy") (dicta).

■ Finally, Mr. Haqq did not lose his privacy expectation in the suitcase when Mr. Myers placed it in Cedric's room. The apartment is quite small, and Mr. Haqq testified that he told Mr. Myers to put all their bags from the road trip, including the suitcase, in Cedric's room "because they would have been in [his] way in the [living] room." 11/6 Tr. at 16:11–12. The door to Cedric's room was generally left open, and it was used by all tenants in the apartment. 11/21 Tr. at 30:3–9. Thus, Mr. Haqq's direction to Mr. Myers to place the suitcase in there was no different than placing it in the kitchen or living room, for present purposes. *Bumper v. North Carolina,* 391 U.S. 543, 548 n. 11, 88 S.Ct. 1788, 20 L.Ed.2d 797. Furthermore, the suitcase, even in Cedric's room, still contained Mr. Haqq's personal belongings. Under these circumstances, it is clear that Mr. Haqq had a reasonable expectation of privacy in the suitcase, and that such expectation was not relinquished prior to the

---

to use his," he answered, *"I don't recall* discussing it with him." 11/21 Tr. at 20:19–24. *Compare id. with* 11/6 Tr. at 5:20–21 (Mr. Haqq testifying on direct examination that "If I needed something, like Reginald [Peavy] himself, we had an agreement that he could use anything of mine") and *id.* at 13:17–24 (Mr. Haqq testifying on cross examination that he had borrowed a sweater from Mr. Peavy, and that Mr. Peavy had borrowed a coat from him).

9. This case is therefore distinguishable from the "sudden bailment" situation confronted in *Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

10. The Government refers to this room as "Peavy's room." *E.g.,* Gov. Mem. at 6. Mr. Peavy admitted on cross examination, however, that it was, in fact, Cedric's room, 11/21 Tr. at 28:23–24, 29:7–8 and that Mr. Peavy shared it with him, occasionally sleeping in the bed together with the six year old. *Id.* at 28:17–22.

11. Mr. Haqq testified that Mr. Peavy did not give Mr. Myers permission to use the suitcase, but rather only gave Mr. Haqq permission. 11/6 Tr. at 14:21–25. This testimony is consistent with Mr. Haqq's management of Mr. Myers's use of the suitcase.

search in question. *See Haqq*, 278 F.3d at 53 ("it appears that [Haqq's] expectation [of privacy in the suitcase] was entirely reasonable unless the district court finds that Peavy forbade Haqq to use Peavy's suitcase") (Meskill, J., concurring).

## CONCLUSION

We find that Mr. Haqq had a reasonable expectation of privacy in the suitcase at the time it was searched by the police. Consequently, we re-affirm our prior oral opinion that, because the seized guns were not in plain view, all the evidence seized by Det. Hanna is excluded, as are the statements and evidence subsequently obtained. *See* 12/18 Tr. at 2:12–10:25. The Government is directed to report to the Court no later than August 14, 2002, as to its proposed course of action with respect to this case.

**IT IS SO ORDERED.**