UNITED STATES of America, Appellee,

v.

Thomas Neal
HENDRICKSON, Appellant.

No. 90–2575.

United States Court of Appeals,
Eighth Circuit.

Submitted March 15, 1991.

Decided July 30, 1991.

Blake Parker, Fort Dodge, Iowa, for appellant.

Ana Marie Martel, Cedar Rapids, Iowa, for appellee.

Before WOLLMAN and BEAM, Circuit Judges, and LARSON,* Senior District Judge.

LARSON, Senior District Judge.

Defendant Thomas Hendrickson was convicted by a jury of two counts of possession of a firearm as a previously convicted felon. Hendrickson appeals the denial of his motion to suppress the rifles police obtained in two searches of a storage unit Hendrickson had rented from Diversified Storage. Hendrickson also challenges his two concurrent 15 year sentences, imposed under 18 U.S.C. §§ 922(g) and 924(e)(1).[1] We affirm the district court's[2] judgment and sentence.

A. The Search of Defendant's Rented Storage Unit

On Sunday, September 11, 1988, Hendrickson rented a storage unit from Lucille Larson, owner and operator of Diversified Storage. Diversified Storage's building was typical of many storage rental facilities: a rectangular-shaped building with a pitched roof. One "long unit" ran the length of the building in the center. Farm equipment was often stored in this unit, and its ceiling extended all the way to the roof.

Larson showed Hendrickson unit # 56 and watched him place a set of golf clubs and other items in the unit. Unit # 56 was one of the many units which ran along either side of the long unit. The unit was eight feet long and ten feet wide. Its walls were approximately nine feet high and were made out of particle board; the fourth wall was an opaque garage door with no windows. Four to six feet of air space existed between the chicken wire ceiling over unit # 56 and the roof of the storage shed. Hendrickson applied his own lock to the door.

After observing Hendrickson's behavior, Larson became suspicious and called the Webster County Sheriff's Department. The next day, she instructed manager Greg Carlson to cooperate with law enforcement officials and to observe unit # 56 and any activities with regard to that unit. She further instructed Carlson to look into unit # 56 by entering an adjacent, empty unit. On Wednesday, September 14, Carlson entered unit # 55 as instructed, climbed a ladder, cut and loosened approximately eight inches of the chicken wire ceiling of the unit, and looked over into unit # 56. Carlson provided the Webster County Sheriff with a list of items he observed in unit # 56, including a rifle, a set of golf clubs, a music board, a walkie-talkie, a TV set, and some small portable stereos.

Shortly thereafter, Lieutenant Gerry Bearden, a Story County Deputy Sheriff, met with Webster County officers. Lieutenant Bearden had investigated two burglaries on Sunday, September 11, and the missing items appeared similar to the list of items Carlson had observed in unit # 56. Bearden went to Diversified Storage and,

---

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. Section 922(g) provides:

It shall be unlawful for any person—
(1) who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year
....
to ... possess ... any firearm or ammunition.
18 U.S.C. § 922(g)(1).

Section 924 sets forth the penalties for violations of section 922(g) as follows:
In the case of a person who violates section 922(g) of this title and has three previous convictions ... for a violent felony ... such person shall be fined not more than $25,000 and imprisoned not less than fifteen years.
18 U.S.C. § 924(e)(1).

2. The Honorable David R. Hansen, United States District Judge for the Northern District of Iowa.

with owner Lucille Larson's consent, examined the contents of unit # 56 by looking over the top of the unit from adjacent unit # 55. Bearden noted additional items which appeared to match the description of the stolen property. After confirming that Hendrickson's car tires matched the tire tracks Bearden had observed when investigating the recent robberies, Bearden obtained an arrest warrant for Hendrickson and a search warrant for unit # 56.

While executing the warrant and a subsequent warrant for items stolen in a Sac County robbery, officials recovered two stolen rifles, which formed the basis of the two count indictment brought against Hendrickson. Hendrickson argues that the district court erred in denying his motion to suppress the rifles, because his fourth amendment right to privacy was violated when Diversified Storage manager Carlson and Lieutenant Bearden looked into the storage unit he had rented.

### B. A Legitimate Expectation of Privacy

■ As the magistrate's [3] report and recommendation recognizes, the validity of the searches challenged by Hendrickson turns on whether there is a constitutionally protected reasonable expectation of privacy in the rented storage unit. The government assumes for purposes of appeal that Hendrickson had manifested a subjective expectation of privacy in unit # 56. *See California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986). The issue presented here is whether society is willing to recognize that expectation as reasonable. *Id. See Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 1687, 1689–90, 109 L.Ed.2d 85 (1990); *Florida v. Riley*, 488 U.S. 445, 450–52, 109 S.Ct. 693, 696–97, 102 L.Ed.2d 835 (1989).

Since the decision in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), it has been the law that "capacity to claim the protection of the Fourth Amendment depends ...

upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." ... A subjective expectation of privacy is legitimate if it is " 'one that society is prepared to recognize as "reasonable." ' "

*Olson*, 110 S.Ct. at 1687 (citations omitted). *See Riley*, 488 U.S. at 453–55, 109 S.Ct. at 697–99 (O'Connor, J., concurring).

■ The test for legitimacy is not whether an individual chooses to conceal his or her activity, but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Ciraolo*, 476 U.S. at 212, 106 S.Ct. at 1812 (citing *Oliver v. United States*, 466 U.S. 170, 181–83, 104 S.Ct. 1735, 1742–43, 80 L.Ed.2d 214 (1984)). According to Professor LaFave,

the ultimate question under *Katz* "is a value judgment," namely, "whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society."

1 W. LaFave & J. Israel, *Criminal Procedure* § 3.2 at 165 (1984) (citing Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 403 (1974)).

Thus, in *Ciraolo*, the Supreme Court found no Fourth Amendment privacy interest implicated in an aerial observation of defendant's backyard, where defendant had been cultivating marijuana behind a six foot outer fence and a ten foot inner fence. *Ciraolo*, 476 U.S. at 209, 215, 106 S.Ct. at 1810, 1813. The mere fact that the defendant had taken measures to restrict some views of his activities did not preclude "an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *Id.* at 213, 106 S.Ct. at 1812.

---

**3.** The Honorable John A. Jarvey, Chief United States Magistrate Judge for the Northern District of Iowa.

The search in this case was not of defendant's home or curtilage,[4] but rather of a commercial storage unit. The walls and garage door of this unit were windowless, but the magistrate found that the chicken wire ceiling of the unit was "the functional equivalent of almost no ceiling at all." Because of the large air space between the chicken wire and the roof of the storage facility, the contents of unit # 56 could be viewed easily by, for example, a farmer driving his combine into the long unit for storage purposes.

Defendant emphasizes that the observations in this case were not made from the long unit, which was rented at the time, but rather were made by standing on a ladder and looking through a hole cut in the chicken wire ceiling of an empty, adjacent unit. Defendant's position thus rests in large part on the manager's method of observation: he concedes that if the manager had looked into unit # 56 from the long unit instead of by cutting the chicken wire above unit # 55, his argument with regard to the defendant's expectation of privacy would be "more difficult."[5]

We find the manager's method of observation was not so invasive, extraordinary, or unexpected that the observations invaded any legitimate expectation of privacy in the commercial rental unit. *See Dow Chemical Co. v. United States*, 476 U.S. 227, 237–39, 106 S.Ct. 1819, 1826–27, 90 L.Ed.2d 226 (1986). In *Dow Chemical*, the Supreme Court held that taking photographs of Dow's industrial facilities from navigable airspace using an aerial mapping camera was not prohibited by the Fourth Amendment. *Id.* at 239, 106 S.Ct. at 1827. Although the Court recognized that the use of highly sophisticated surveillance equipment might be constitutionally proscribed

absent a warrant, the Court stated that "[t]he mere fact that human vision is enhanced somewhat, at least to the degree here, does not give rise to constitutional problems." *Id.* at 238, 106 S.Ct. at 1826.

More recently, in *Florida v. Riley*, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989), the Court found no constitutional problem with aerial observations made by police in a helicopter flying at 400 feet. *Id.* at 451–52, 109 S.Ct. at 696–97. Justice O'Connor's concurrence emphasized that defendant had failed to show that flights at this altitude were so rare that police surveillance from such altitudes would violate reasonable expectations of privacy. *Id.* at 455, 109 S.Ct. at 699 (O'Connor, J., concurring). In *Riley, Dow Chemical Co.,* and *Ciraolo,* the Court's decision was based on the notion that the possibilities for air travel today are so routine that an expectation of privacy from aerial observation is not one that society is prepared to recognize as reasonable. *Riley,* 488 U.S. at 454–55, 109 S.Ct. at 698 (O'Connor, J., concurring); *Dow Chemical Co.,* 476 U.S. at 234–35, 106 S.Ct. at 1824–25; *Ciraolo,* 476 U.S. at 215, 106 S.Ct. at 1813.

In this case, we likewise conclude that the possibilities for observations through the chicken wire ceiling of unit # 56 are sufficiently routine that the observations made here cannot be said to have infringed upon a legitimate expectation of privacy. *See Riley,* 488 U.S. at 455, 109 S.Ct. at 699. As the magistrate found, given the open ceiling of unit # 56, a reasonable person would assume that its contents could be viewed from above by the owner or manager of the units and by other persons renting or using the units for any number of reasons.[6] Under these circumstances, we

---

**4.** The curtilage is the land and buildings immediately adjacent to a home to which the activity of home life extends. *See Dow Chemical Co. v. United States,* 476 U.S. 227, 236 & n. 6, 106 S.Ct. 1819, 1827 & n. 6, 90 L.Ed.2d 226 (1986). *See also Black's Law Dictionary* (6th ed. 1990); *California v. Ciraolo,* 476 U.S. 207, 212–13, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986).

**5.** The record reflects that the manager considered contacting the farmer who had rented the long unit for permission to enter it, but the

decision was made not to trouble the farmer because he was going through bankruptcy.

**6.** The reasons identified by the magistrate include "idle curiosity, to determine the source of odors from objects stored in other units, casual observations while stacking or otherwise storing objects in the long unit above the height of the walls, repair work to damaged chicken wire or other structural problems, or any other number of situations where one might be in a position to look into the unit."

agree with the magistrate's assessment that a person concerned with the privacy of the contents of a unit could cover the items with a blanket or some other opaque covering.

Based on all the factors described above, we conclude the district court properly denied defendant's motion to suppress the rifles obtained from unit #56 pursuant to the search warrants obtained by police. The observations made through the chicken wire ceiling of the commercial storage unit rented by the defendant, which provided the basis for the search warrants issued by the magistrate judge, violated no constitutionally protected privacy interest.

### C. Sentencing

 Defendant also challenges his sentence, claiming that a 1967 conviction for breaking and entering was not a "violent felony" under 18 U.S.C. § 924(e)(2)(B), because he was sentenced to less than a year for the crime.[7] An offense constitutes burglary for purposes of section 924(e) if its statutory definition substantially corresponds to "generic" burglary or if the charging paper and jury instructions actually required the jury to find all the elements of generic burglary in order to convict the defendant. *Taylor v. United States,* — U.S. ——, 110 S.Ct. 2143, 2160, 109 L.Ed.2d 607 (1990). We agree with the district court that defendant's conviction for breaking and entering Blackie's Body Shop corresponds to generic burglary. *See id.* 110 S.Ct. at 2159-60. Defendant's 1967 conviction was thus properly considered to be a "violent felony" under § 924(e).

### D. Conclusion

For all of the foregoing reasons, the judgment and sentence of the district court are affirmed.

7. 18 U.S.C. § 924(e)(2)(B) provides in relevant part:
> [T]he term "violent felony" means any crime punishable by imprisonment for a term exceeding one year ... that ... is burglary. . . .

Under Iowa Code § 708.8 (1962), the maximum penalty for breaking and entering was imprisonment for ten years.