OPINION
George W. Rackham, defendant-appellant, appeals the April 13, 2000 judgment of the Franklin County Court of Common Pleas finding him guilty of: (1) engaging in a pattern of corrupt activity, in violation of R.C.2923.32, a second-degree felony; (2) having a weapon while under disability, in violation of R.C. 2923.13, a fifth-degree felony; (3) three counts of receiving stolen property with a finding that the property was a motor vehicle and that the value of the property was more than $500, violations of R.C. 2913.51, fourth-degree felonies; (4) two counts of receiving stolen property, violations of R.C. 2913.51, fifth-degree felonies; (5) tampering with identification numbers, in violation of R.C. 4549.62, a fifth-degree felony; (6) possession of criminal tools, in violation of R.C. 2923.24, a fifth-degree felony; and (7) possession of marijuana with a gun specification, in violation of R.C. 2925.11, a minor misdemeanor.
In January 1998, a confidential source informed Columbus Police Detective Ron Cordial, of the Career Criminal Unit, that appellant was involved in a theft ring, which stole Harley-Davidson motorcycles ("Harleys"), automobiles, power tools, and various other items. On January 7, 1998, the source indicated that appellant had a stolen blue and white Harley and that the Harley and other motorcycles, parts, and items were in a storage unit located on Kinnear Road in Columbus, Ohio.
On January 16, 1998, Cordial obtained a subpoena and went to the storage facility on Kinnear Road. He discovered that unit C-034 was rented by Matt Rackham, appellant's father. Cordial rented unit B-101, the unit immediately behind C-034. Cordial entered B-101 and noticed that above the eight to ten-foot, corrugated steel common wall between the units was a seventeen-inch space between the top of the wall and the ceiling. Although Cordial did not have a search warrant, he placed a ladder inside B-101, leaned it against the common wall, and looked through the seventeen-inch gap with a flashlight into unit C- 034. In C-034, Cordial saw a blue and white assembled Harley. He also testified that he saw at least two other disassembled Harleys, at least one disassembled Honda motorcycle, tools, tires, and motorcycle parts. Cordial testified that he did not "break the plane" of the wall to look into unit C-034.
On January 17, 1998, police placed a camera in B-101 near the seventeen-inch gap and recorded appellant and another man, Russell Scott Parker, filing off vehicle identification numbers and transporting motorcycles and parts to and from C- 034. On January 22, 1998, Cordial and Detective Dan Cheadle again looked into C-034 and saw that the blue and white Harley had been disassembled. Using this information, a search warrant was obtained on January 23, 1998, and on January 24 a "sneak-and-peak" search was conducted of C-034, during which time the contents were inventoried. Several motorcycles, motorcycle engines, and other parts were inventoried, some of which had ground-off serial numbers. From January 30 to February 27, 1998, a video camera mounted in B-101 was used to conduct a surveillance of C-034 through the seventeen-inch gap above the common wall.
On February 5, 1998, Parker rented another unit, C-028. On that same day, officers observed Parker removing various items from C-034 and placing them into C-028. On February 8 and 17, 1998, appellant and Parker were again observed dragging various items, including motorcycle engines from C-034 to C-028. On February 20, 1998, a search warrant was obtained for C-028. Cheadle entered the unit and found a stolen stump grinder, a gasoline tank from a stolen motorcycle, tools, and the blue and white Harley.
On February 26, 1998, police obtained a search warrant for the home of appellant's girlfriend, Michelle Kennedy. During the search, officers found a triple-beam scale, a 9mm Ruger P-89 handgun, several pieces of antique furniture, a rifle, a .45 handgun, and a Wilson gym bag filled with marijuana, various weapons, saws, and tools. After filing felony warrants on appellant the same day, Cordial executed a stop of appellant's car. Appellant attempted to flee but was eventually caught. Upon searching appellant's car, police found approximately one pound of marijuana for which he was arrested and later released.
On July 24, 1998, Cordial and other officers executed a warrant on James L. "Pops" Teasley's farm in Kentucky, whom appellant had been seen with on several occasions. When the officers entered the farm, appellant, "Pops," and another passenger attempted to flee in a truck driven by Pops although appellant was eventually caught by a Kentucky state trooper.
A Franklin County grand jury returned a multiple-count indictment against appellant alleging that appellant engaged in a pattern of corrupt activity, had committed numerous violations of receiving stolen property, had a weapon while under disability, and possession of marijuana.
Prior to trial, appellant filed a motion to suppress evidence claiming that Cordial's peering over the common wall of the units constituted an illegal search. A hearing on appellant's motion was held on January 4, 2000, at which time the trial court overruled the motion finding that there was a lack of a reasonable expectation of privacy, given the gap at the top of the wall. A jury trial commenced on January 5, 2000. The state called numerous witnesses, including several Columbus Police officers involved in the investigation, a special agent with the National Crime Insurance Bureau, and the manager of the storage company. Appellant's father, Matthew Rackham, testified on behalf of appellant.
The jury returned a guilty verdict on all twelve counts. On April 13, 2000, a sentencing hearing took place. The court entered a nolleprosequi as to thirty-nine counts. The trial court sentenced appellant to maximum terms on each count to run consecutively with one another, totaling nineteen and one-half years. Appellant appeals the judgment of the trial court, asserting the following assignments of error:
 ASSIGNMENT OF ERROR ONE THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT OVERRULED DEFENDANT'S MOTION TO SUPPRESS EVIDENCE IN VIOLATION OF BOTH THE OHIO AND FEDERAL CONSTITUTIONS.
 ASSIGNMENT OF ERROR TWO THE TRIAL COURT ERRED WHEN IT IMPOSED THE MAXIMUM AVAILABLE SENTENCE CONSECUTIVELY ON EACH COUNT.
 ASSIGNMENT OF ERROR THREE THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 ASSIGNMENT OF ERROR FOUR DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.
Appellant asserts in his first assignment of error that the trial court erred when it overruled his motion to suppress evidence in violation of the Ohio and United States Constitutions. The basis of this assignment of error is that the January 16, 1998 search that Cordial conducted at the storage facility on Kinnear Road (by peering over the wall), and the January 17, 1998 search conducted by use of the surveillance camera were unconstitutional and, thus, any fruits of such searches should be suppressed. At a hearing on a motion to suppress, the trial court functions as the trier of fact. On review, an appellate court must accept the trial court's findings of fact if those findings are supported by competent, credible evidence. State v. Retherford (1994),93 Ohio App.3d 586, 592. Relying on the trial court's factual findings, the appellate court must then determine "without deference to the trial court, whether the court has applied the appropriate legal standard."State v. Anderson (1995), 100 Ohio App.3d 688, 691.
The threshold question is whether police conduct amounted to a search or seizure. Under Fourth Amendment law, "'[a] "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.'" State ex rel. Rear Door Bookstore v. Tenth Dist. Court ofAppeals (1992), 63 Ohio St.3d 354, 364, quoting United States v. Jacobsen
(1984), 466 U.S. 109, 113, 104 S.Ct. 1652, 1656. To decide if an individual has a constitutionally protected reasonable expectation of privacy, courts consider: (1) whether the individual displayed a subjective expectation of privacy in the object of the challenged search; and (2) whether society is willing to recognize the particular expectation as reasonable. California v. Ciraolo (1986), 476 U.S. 207,211, 106 S.Ct. 1809, 1811. In this regard, the United States Supreme Court has stressed that "'[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject ofFourth Amendment protection.'" Id. at 213, 1813, quoting Katz v. United States
(1967), 389 U.S. 347, 351, 88 S.Ct. 507, 511. Typically, a reasonable expectation of privacy does not exist where illegal activities are conducted in places which can be viewed by persons passing by. See,e.g., State v. Taylor (1978), 61 Ohio App.2d 209 (finding no expectation of privacy where apartment window overlooked semi-public walkway and had no curtains or other obstructions to view).
We find that appellant did not have a reasonable expectation of privacy of the contents of the storage unit and Cordial's observation did not constitute a search. See, e.g., United States v. Fields (C.A.2, 1997),113 F.3d 313 (holding that the Fourth Amendment was not violated when officers peered into an apartment window from the side yard through a gap beneath the venetian blinds). We find unconvincing appellant's statement that "there was no reason to believe that anyone in the adjoining storage unit would obtain a ladder and look through the seventeen inch gap, which was 8 to 10 feet above the ground, and peer over to items in unit C-034." This statement by appellant seems to reflect more his calculation of the odds of somebody looking through the gap and his being caught, rather than his sincere belief that he reasonably expected privacy from the surrounding units.
We find compelling the state's citation to U.S. v. Hendrickson (C.A. 8, 1991), 940 F.2d 320. In Hendrickson, after a manager at a rental storage facility became suspicious of a renter, an employee at the storage facility looked into the defendant's storage unit by entering an adjacent, empty unit, climbing a ladder, and cutting and loosening approximately eight inches of the chicken wire ceiling above the defendant's unit. The employee provided the police with a list of items he observed in the unit. With the consent of the facility's owner, a police officer examined the contents of the defendant's unit by looking over the top of the unit from the adjacent unit. Police arrested the defendant and obtained a search warrant for his unit. The defendant argued that the court erred in denying his motion to suppress the evidence found in the storage unit because his Fourth Amendment right to privacy was violated when the employee and the police officer looked into the storage unit he had rented.
On appeal, the court affirmed the trial court's denial of defendant's motion to suppress, finding there had been no Fourth Amendment violation. The trial court adeptly and extensively explained its reasoning:
 The search in this case was not of defendant's home or curtilage, but rather of a commercial storage unit. The walls and garage door of this unit were windowless, but the magistrate found that the chicken wire ceiling of the unit was "the functional equivalent of almost no ceiling at all." Because of the large air space between the chicken wire and the roof of the storage facility, the contents of unit # 56 could be viewed easily by, for example, a farmer driving his combine into the long unit for storage purposes.
 Defendant emphasizes that the observations in this case were not made from the long unit, which was rented at the time, but rather were made by standing on a ladder and looking through a hole cut in the chicken wire ceiling of an empty, adjacent unit. Defendant's position thus rests in large part on the manager's method of observation: he concedes that if the manager had looked into unit # 56 from the long unit instead of by cutting the chicken wire above unit # 55, his argument with regard to the defendant's expectation of privacy would be "more difficult."
 We find the manager's method of observation was not so invasive, extraordinary, or unexpected that the observations invaded any legitimate expectation of privacy in the commercial rental unit. See Dow Chemical Co. v. United States, 476 U.S. 227, 237-39, 106 S.Ct. 1819, 1826-27, 90 L.Ed.2d 226 (1986). In Dow Chemical, the Supreme Court held that taking photographs of Dow's industrial facilities from navigable airspace using an aerial mapping camera was not prohibited by the Fourth Amendment. Id.
at 239, 106 S.Ct. at 1827. Although the Court recognized that the use of highly sophisticated surveillance equipment might be constitutionally proscribed absent a warrant, the Court stated that "[t]he mere fact that human vision is enhanced somewhat, at least to the degree here, does not give rise to constitutional problems." Id. at 238, 106 S.Ct. at 1826.
* * *
 In this case, we likewise conclude that the possibilities for observations through the chicken wire ceiling of unit # 56 are sufficiently routine that the observations made here cannot be said to have infringed upon a legitimate expectation of privacy. * * * As the magistrate found, given the open ceiling of unit # 56, a reasonable person would assume that its contents could be viewed from above by the owner or manager of the units and by other persons renting or using the units for any number of reasons. Under these circumstances, we agree with the magistrate's assessment that a person concerned with the privacy of the contents of a unit could cover the items with a blanket or some other opaque covering. Id. at 323-324.
The reasoning in Hendrickson can be applied with equal force to the present case. Because of the large seventeen-inch space between the top of the wall and the roof of the storage facility, the contents of appellant's unit could be viewed easily by any adjacent unit owner; for example, another renter using a ladder to stack boxes or other objects all the way to the ceiling could have easily observed the contents of appellant's unit. The present case is even more compelling thanHendrickson in that, in the current case, the "method of observation" was less intrusive than in Hendrickson. In the present case, the police merely had to look through the large gap and did not have to take the extra steps of cutting wire or poking through a ceiling. Further, as inHendrickson, we likewise conclude that the possibilities for observations through the gap in the wall and ceiling are sufficiently routine and that the observations made by the police cannot be said to have infringed upon a legitimate expectation of privacy. Because of the gap at the top of the wall, a reasonable person would assume that the contents of their unit could be viewed from above by the owner or manager of the units or by other persons renting or using the units for any number of reasons, including idle curiosity, to determine the source of odors from objects stored in other units, casual observations while stacking or otherwise storing objects in the adjoining unit above the height of the walls, or while performing repair work to damaged walls or other structural problems. See id. at 324, fn 6. Additionally, if appellant were truly concerned about privacy of the contents of C-034, he could have covered the items.
Under the present circumstances, we find that the trial court properly denied appellant's motion to suppress. The observations made by Cordial looking through the gap between the wall and ceiling of the unit rented by appellant, which provided the basis for the search warrants, violated no constitutionally protected privacy interest. Therefore, appellant's first assignment of error is overruled.
Appellant argues in his second assignment of error that the trial court erred in imposing his jail sentence. The trial court issued a judgment entry imposing the maximum sentence on each count and ordering that appellant's terms of incarceration be served consecutively with each other, totaling nineteen and one-half years.
Consistent with the analysis of the analogous provision found in R.C.2929.19(B)(2)(d), as set forth by the Supreme Court in State v. Edmonson
(1999), 86 Ohio St.3d 324, a trial court is required pursuant to R.C.2929.19(B)(2)(a) to specify on the record a finding that gives its reasons for selecting a prison term when it imposes terms of imprisonment for felonies of the fourth and fifth degree. See State v. Kawaguchi
(2000), 137 Ohio App.3d 597 . Specifically, R.C. 2929.19(B)(2)(a) directs a court to give its reasons for imposing a sentence based upon the principles in R.C. 2929.11 and 2929.13(B)(1). In the present case, pursuant to R.C. 2929.11(A) and (B), the trial court found that the sentences were necessary to protect the public from future crime, to punish appellant, and were commensurate with the seriousness of the crimes. Further, pursuant to R.C. 2929.13(B)(1), the trial court noted that appellant had previously served prison terms for a number of offenses.
In enunciating its reasons for imposing the term of imprisonment, the trial court found that since 1985, appellant had been found guilty of possession of criminal tools twice, receiving stolen property four times, grand theft twice, and an unlawful weapons transaction. Appellant had been sent to prison on at least five separate occasions during that time. The court noted that his record demonstrated an ongoing pattern of behavior. The trial court stated that appellant was "a thief, you're going to be a thief forever, you're never going to stop." The trial court also stated that:
 * * * [i]f we let you out of prison, other people are going to lose their stuff because you're going to steal it, and if you're not stealing it, what you're going to do is you're going to facilitate other people's ability to move it after they have stolen it, because this is obviously very organized behavior that you're engaged in.
The trial court went on to find that appellant was "absolutely incorrigible," stating:
 I've lost track of how many times for the same kind of behavior and you won't change, so I think what the courts finally do is give up any hope of changing anybody, and all we can do is put you away for as long as we possibly can so nobody else will be bothered by you. I'm at a loss as to what else to do.
Further, the trial court added: "You just made countless numbers of people's lives absolutely miserable by stealing their property. Life is tough enough without having to deal with insurance companies on a daily basis." We find that these reasons, including appellant's long history of thefts, were sufficient for the trial court to impose the sentence pursuant to R.C. 2929.19(B(2)(a).
With regard to the trial court's imposition of the maximum sentence upon appellant, R.C. 2929.14(C) provides:
 Except as provided in division (G) of this section or in Chapter 2925. of the Revised Code, the court imposing a sentence upon an offender for a felony may impose the longest prison term authorized for the offense pursuant to division (A) of this section only upon offenders who committed the worst forms of the offense, upon offenders who pose the greatest likelihood of committing future crimes, upon certain major drug offenders under division (D)(3) of this section, and upon certain repeat violent offenders in accordance with division (D)(2) of this section.
In imposing the maximum sentences pursuant to R.C. 2929.14(C), the trial court found that appellant had the greatest likelihood of committing future crimes and that he had committed the worst forms of the offense. The trial court was not required to give its reasons for sentencing appellant to the maximum terms of imprisonment for the offenses because the present circumstances did not fall under either of the categories delineated in R.C. 2929.19(B)(2)(d) or (e). Appellant's sentence was for more than two offenses and arose out of more than a single incident, thereby removing it from the purview of both subsections (d) and (e). If the legislature had intended that the trial court give reasons under all circumstances every time it imposed a maximum sentence, it could have simply provided for such with a blanket requirement as it did with regard to consecutive sentences in R.C.2929.19(B)(2)(c). Thus, in imposing maximum prison terms in this case, the trial court needed only to include the findings in R.C. 2929.14(C), which it did. However, even if the trial court were required to give its reasons pursuant to subsection (d) or (e) and Edmonson, it clearly did give sufficient reasons, as outlined above.
With regard to consecutive sentences, our standard of review is whether we can find that the imposition of consecutive sentences was supported by clear and convincing evidence. R.C. 2953.08. In order to impose consecutive sentences, when an offender is convicted of multiple offenses, a court must first find that consecutive sentences are necessary to protect the public or punish the offender. R.C. 2929.14(E)(4). The court must also find that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. Id. Further, the trial court must find one or more of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. Id.
Finally, if a trial court imposes consecutive sentences, the trial court must give its reasons for imposing the given sentences. R.C.2929.19(B)(2)(c). The requirement in R.C. 2929.19(B)(2)(c) that a trial court give its reasons for selecting consecutive sentences goes beyond the requirement that the trial court make findings required by R.C.2929.14. State v. Belfon (July 13, 2000), Franklin App. No. 99AP-663, unreported. Rather, R.C. 2929.19(B)(2) and its subsections require a trial court to provide an explanation to support its findings. Edmonson,supra, at 326.
In the present case, the oral pronouncement by the court sets forth the statutory language covering all of the necessary requirements for consecutive sentencing pursuant to R.C. 2929.14(E)(4) and subsection (c). Further, the trial court stated its reasons for imposing consecutive sentences, pointing to appellant's lengthy history of thefts, the seriousness of the effects of his actions on the victims, and his future threat to the public due to his "incorrigible" conduct. Therefore, appellant's second assignment of error is overruled.
Appellant argues in his third assignment of error that the trial court's decision was against the manifest weight of the evidence and supported by insufficient evidence. Specifically, this argument raises two separate issues. "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. In Thompkins, the court explained the distinctions at length:
 With respect to sufficiency of the evidence, "`sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486 * * *. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45 * * * citing Jackson v. Virginia (1979), 443 U.S. 307 * * *.
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487 * * *. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.) Black's, supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a '"thirteenth juror"' and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42 * * *. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175 * * * ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."). Id. at 386-387.
Appellant presents no argument in his brief and points to no specific evidence or error to support this assignment of error. With regard to the sufficiency of the evidence argument, we find that there was sufficient evidence to find appellant guilty of engaging in a patter of corrupt activity, in violation of R.C. 2923.32; having a weapon while under disability, in violation of R.C. 2923.13; three counts of receiving stolen property with a finding that the property was a motor vehicle and that the value of the property was more than $500, in violation of R.C.2913.51; two counts of receiving stolen property, in violation of R.C.2913.51; tampering with identification numbers, in violation of R.C.4549.62; possession of criminal tools, in violation of R.C. 2923.24; and possession of marijuana with a gun specification, in violation of R.C.2925.11. The evidence in this case demonstrates that any rational trier of fact could have found appellant guilty of the offenses. Therefore, we find that there was sufficient evidence to find appellant guilty beyond a reasonable doubt.
Appellant also argues in this assignment of error that the trial court's decision was against the manifest weight of the evidence. After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find that the jury did not clearly lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The jury apparently chose to believe the state's witnesses and appellant's only witness, his father, added little relevant evidence. The weight to be given the evidence and the credibility of the witnesses are primarily matters for the finder of fact to determine, and it is not the function of the appellate court to substitute its judgment for that of the factfinder. State v. Grant (1993), 67 Ohio St.3d 465;State v. D'Ambrosio (1993), 67 Ohio St.3d 185. Importantly, we find that the evidence does not "weigh heavily against the conviction," and thus, the conviction was not against the manifest weight of the evidence. Based upon the foregoing, appellant's third assignment of error is overruled.
Appellant argues in his fourth assignment of error that he was denied effective assistance of counsel during trial. Appellant claims that his trial counsel only met with him for a total of fifteen minutes before trial and failed to review videotapes with him, thereby hindering appellant's ability to consider a plea agreement. To prevail on a claim of ineffective assistance of counsel, a defendant must show both deficient performance and resulting prejudice. Strickland v. Washington (1984),466 U.S. 668, 687. In order to demonstrate deficiency, a defendant must show that counsel's representation fell below an objective standard of reasonableness. Id. at 688. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. Id. The adequacy of counsel's performance is reviewed in light of all the circumstances surrounding the trial. Id.
"Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time." State v. Cook
(1992), 65 Ohio St.3d 516, 524-525. Assuming that counsel's performance was ineffective, the defendant must still show that the error had an effect on the judgment. State v. Bradley (1989), 42 Ohio St.3d 136, 142. Reversal is warranted only where the defendant demonstrates that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id.
The record reveals that the representation by appellant's counsel did not fall below an objective standard of reasonableness. At the January 3, 2000 hearing on appellant's motion to suppress, appellant's counsel stated that he had reviewed all of the documents provided to him by the prosecution and had a "couple" of conversations with appellant regarding their contents. Although appellant stated that he had two meetings with his attorney, though claims the two only spoke for fifteen minutes, his counsel stated that appellant was underestimating the amount of time they had discussed the case. Appellant's counsel said he had reviewed thousands of pages of evidence in preparation for trial. Further, the prosecutor stated that appellant's counsel had been in his office innumerable times regarding the present case, that he spent hours discussing the case and going over the evidence with him, and that appellant's counsel was provided copies of all of the evidence in the prosecution's possession. Based upon the record, it appears that appellant's trial counsel's preparation was not deficient.
However, even if it could be said that the performance of appellant's counsel was somehow deficient as of January 3, 2000, appellant has failed to show that the results would have been any different. On January 3, 2000, after appellant's counsel agreed that appellant had not seen certain videotapes that tended to incriminate him, the trial court ordered that the plea offer remain open until appellant had an opportunity to review the videotapes and other evidence against him. On January 5, 2000, before the jury was sworn in, trial counsel stated that he and appellant had gone to the prosecutor's office at which time the prosecutor presented the evidence to appellant in the same fashion that he was going to present it to the jury. Appellant, his counsel, and the prosecutor reviewed the videotapes, photographs, pictures, all of the evidence seized, the witnesses the prosecution intended to call, and discussed how the prosecution intended to connect all of the evidence and testimony. Appellant's counsel then stated that "I think there was working knowledge here * * * of [appellant] to understand what the nature of the plea offer is, and his decision to reject that I think was based on sufficient information." Appellant's counsel also stated that he went over the indictment and discussed the potential sentencing with appellant. Upon direct questioning by the judge, appellant stated that he understood the plea offer, had discussed it with his counsel, and did not wish to accept the offer. Therefore, it is apparent that even if the performance of appellant's trial counsel could be construed as deficient as of January 3, 2000, appellant gained sufficient knowledge of the evidence against him as of January 5, 2000, in order to knowingly accept or deny the plea offer.
Appellant also argues that during the suppression hearing, his trial counsel should have called the municipal court judge who issued the search warrant to illustrate that the judge relied upon the information emanating from the unlawful search. As we have already ascertained that there was no unlawful search, this argument is without merit. Therefore, appellant's fourth assignment of error is overruled.
Accordingly, appellant's four assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
BRYANT, P.J. and BOWMAN, J., concur.