*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LONG LAKE TOWNSHIP,

    Plaintiff-Appellee,

v

TODD MAXON and HEATHER MAXON,

    Defendants-Appellants.

FOR PUBLICATION
March 18, 2021
9:15 a.m.

No. 349230
Grand Traverse Circuit Court
LC No. 18-034553-CE

Before: JANSEN, P.J., and FORT HOOD and RONAYNE KRAUSE, JJ.

JANSEN, J.

In this zoning dispute, defendants appeal by leave granted the order of the trial court denying their motion to suppress evidence. At issue is the legality of the use of a drone[1] by plaintiff Long Lake Township to take aerial images of defendants' property without defendants' permission or any other specific legal authorization. Plaintiff relied on those aerial photographs to commence suit against defendants, alleging that defendants were in violation of a zoning ordinance, nuisance law, and a prior settlement agreement between the parties. We reverse the trial court's May 16, 2019 order denying defendants' motion to suppress evidence, and we remand for entry of an order suppressing all photographs taken of defendants' property from a drone and for further proceedings consistent with this opinion.

## I. RELEVANT FACTUAL BACKGROUND

In 2008, the parties litigated an alleged violation of the Long Lake Township Ordinance by defendants. That proceeding culminated in a settlement agreement (the Agreement), in which plaintiff agreed to dismiss its zoning complaint against defendants with prejudice, plaintiff paid a portion of defendants' legal fees, and plaintiff agreed "not to bring further zoning enforcement action against Defendant Maxon based upon the same facts and circumstances which were

---

[1] Also known as an "unmanned aerial vehicle" or "small unmanned aircraft." The particular drone at issue in this matter was operated by nonparty Zero Gravity Aerial.

revealed during the course of discovery and based upon the Long Lake Township Ordinance as it exists on the date of the settlement agreement."

In 2018, plaintiff filed the instant civil action, alleging that defendants had "significantly increased the scope of the junk cars and other junk material being kept on their property" since entering into the 2008 Agreement, and that such activity "constitut[ed] an illegal salvage or junk yard" in violation of the Long Lake Township Zoning Ordinance. In support of these allegations, plaintiff attached aerial photographs taken in 2010, 2016, 2017, and 2018. These photographs showed a "significant increase in the amount of junk being stored on [d]efendants' property."

Defendants moved to suppress the aerial photographs and "all evidence obtained by [p]laintiff from its illegal search of their property." Defendants argued that the aerial surveillance of their property, and the photographs taken by the drones of their property and the surrounding area, constituted an unlawful search in violation of the Fourth Amendment. Defendants argued that the instant case is distinguishable from precedent involving manned aerial surveillance because, unlike fixed wing aircraft and helicopters which "routinely fly over a person's property," drones are equipped with "high power cameras" and do not operate at the same altitudes as airplanes and helicopters. Additionally, defendants argued that a person can reasonably anticipate being observed from the air by a fixed wing aircraft, but aerial surveillance from a drone flying over private property and taking photographs is not a reasonable expectation. Moreover, defendants noted that plaintiff's drone surveillance did not comply with Federal Aviation Administration (FAA) regulations. We note that photographs in the record clearly show that very little, if any, of defendants' property is visible from the ground, due to a combination of buildings and trees.

In response, plaintiff argued that defendants failed to establish how the use of a drone to capture aerial photographs violated their Fourth Amendment rights, because their property was visible from above. Plaintiff also submitted the affidavit of Dennis Winard, owner of Zero Gravity Aerial, who operated the drone that captured the photographs at issue, in response to defendants' claim that the drone was non-complaint with FAA regulations. Winard averred that the photographs at issue were taken on April 25, 2017, May 26, 2017, and May 5, 2018. On those dates, Winard "maintained a constant visual line of sight on the drone and maintained an altitude of less than 400 feet in accordance with the FAA regulations." Plaintiff went on to argue at the hearing on defendants' motion to suppress that defendants did not have a subjective reasonable expectation of privacy in this case.

The trial court denied defendants' motion to suppress the images, finding that defendants did not have a reasonable expectation of privacy. The trial court relied on *Florida v Riley*, 488 US 445; 109 S Ct 693; 102 L Ed 2d 835 (1989), where the United States Supreme Court noted that " 'the visual observation of the defendant's premises from a helicopter did not constitute a search under the Fourth Amendment.' " The trial court further found that FAA regulations were "safety rules and [did] not define the scope of the Fourth Amendment." Defendants moved for reconsideration, which was also denied. This appeal followed. Defendants generally argue that they had a reasonable expectation of privacy that was violated by plaintiff's use of a drone to photograph their property and that the drone operator's alleged noncompliance with FAA regulations was pertinent to the Fourth Amendment analysis.

## II. STANDARD OF REVIEW

We review for clear error the trial court's findings of fact made at a suppression hearing, but we review de novo the trial court's ultimate decision whether to suppress the evidence. *People v Rodriguez*, 327 Mich App 573, 583; 935 NW2d 51 (2019). "A finding is clearly erroneous if it leaves this Court with a definite and firm conviction that the trial court made a mistake." *Id.* (quotation marks and citation omitted). This Court reviews constitutional issues de novo. *People v Jones*, 260 Mich App 424, 427; 678 NW2d 627 (2004). De novo review means that this Court reviews the issue without any deference to the court below. *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018).

## III. LEGAL BACKGROUND

"The Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures." *People v Kazmierczak*, 461 Mich 411, 417; 605 NW2d 667 (2000). The protections of Article 1, § 11 of the 1963 Michigan Constitution "have been construed as coextensive with" the Fourth Amendment. *People v Mead*, 503 Mich 205, 212; 931 NW2d 557 (2019). The basic purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v United States*, ___ US ___, ___; 138 S Ct 2206, 2213; 201 L Ed 2d 507 (2018) (quotation marks and citation omitted) (slip op at p 4).

This is ostensibly a civil proceeding. However, the form of a proceeding may cloak its true nature, depending on the relief sought and what consequences may ensue if a governmental entity prevails. See *People ex rel Strickland v Bartow*, 27 Mich 68, 68-69 (1873); *Boyd v United States*, 116 US 616, 633-635; 6 S Ct 524; 29 L Ed 746 (1886), overruled in part on other grounds in *Warden, Md Penitentiary v Hayden*, 387 US 294; 87 S Ct 1642; 18 L Ed 2d 782 (1967). The Fourth Amendment does not apply to private parties who are not acting as agents of a governmental entity. *United States v Jacobsen*, 406 US 109, 113; 104 S Ct 1652; 80 L Ed 2d 85 (1984). However, the Fourth Amendment may protect parties from unreasonable searches and seizures committed by a governmental entity in civil cases, if the civil case can be considered "quasi-criminal" and the search or seizure was committed by the governmental entity pursuing the action. *Kivela v Dep't of Treasury*, 449 Mich 220, 228-229, 236-239; 536 NW2d 498 (1995) (discussing a test for the admissibility of evidence illegally seized by police for a criminal proceeding in an independent subsequent tax proceeding); *People v Gentner, Inc*, 262 Mich App 363, 369 n 2; 686 NW2d 752 (2004); see also *Camara v Muni Court of City and Co of San Francisco*, 387 US 523, 528-539; 87 S Ct 1727; 18 L Ed 2d 930 (1967) (holding that administrative searches implicate the Fourth Amendment even if the searches are not criminal in nature, albeit subject to less exacting requirements to establish probable cause).

There is no dispute that the drone operator here was acting as an agent for Long Lake Township, that Long Lake Township is a governmental entity, and that Long Lake Township seeks admission of its own allegedly-illegally obtained evidence. The purpose of this litigation is to obtain a declaratory judgment that defendants' use of their own property is illegal. Considering the great historical importance placed on the freedom to use one's own property, and the fact that the consequences of this action may entail far more than merely the imposition of money damages, we conclude that this is the kind of proceeding to which the Fourth Amendment may apply.

Further supporting this conclusion is MCL 259.322(3), which expressly prohibits the use of a drone to "capture photographs, video, or audio recordings of an individual in a manner that would invade the individual's reasonable expectation of privacy."

The first inquiry in any search and seizure issue is whether a search occurred under the Fourth Amendment. *People v Brooks*, 405 Mich 225, 242; 274 NW2d 430 (1979).

> [A] search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy. Whether an expectation of privacy is reasonable depends on two questions. First, did the individual exhibit "an actual, subjective expectation of privacy"? Second, was the actual expectation "one that society recognizes as reasonable"? Whether the expectation exists, both subjectively and objectively, depends on the totality of the circumstances surrounding the intrusion. [*People v Antwine*, 293 Mich App 192, 195; 809 NW2d 439 (2011) (quotation marks and citations omitted).]

The area "immediately surrounding and associated with the home," known as the "curtilage," is "part of the home itself for Fourth Amendment purposes." *Florida v Jardines*, 569 US 1, 6; 133 S Ct 1409; 185 L Ed 2d 495 (2013). "In general, a search or seizure within a home or its curtilage without a warrant is per se an unreasonable search under the Fourth Amendment." *People v Frederick*, 500 Mich 228, 234; 895 NW2d 541 (2017). However, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v United States*, 389 US 347, 351; 88 S Ct 507; 19 L Ed 2d 576 (1967). We note that plaintiff does not, on appeal, seriously dispute whether the area observed by plaintiff's drone was within the curtilage of defendants' home, so we expressly do not decide that issue and focus instead on whether defendants had an actual and reasonable expectation of privacy.

In *Kyllo v United States*, 533 US 27; 121 S Ct 2038; 150 L Ed 2d 94 (2001), Justice SCALIA set forth a brief history of Fourth Amendment jurisprudence and how it evolved to address the development of surveillance technology capable of overcoming the limitations of human eyesight:

> The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." "At the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v United States*, 365 US 505, 511[; 81 S Ct 679; L Ed 2d 734] (1961). With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no. See *Illinois v Rodriguez*, 497 US 177, 181[; 110 S Ct 2793; 111 L Ed 2d 148] (1990); *Payton v New York*, 445 US 573, 586[; 100 S Ct 1371; 63 L Ed 2d 639] (1980).
>
> On the other hand, the antecedent question whether or not a Fourth Amendment "search" has occurred is not so simple under our precedent. The permissibility of ordinary visual surveillance of a home used to be clear because, well into the 20th century, our Fourth Amendment jurisprudence was tied to common-law trespass. See, *e.g.*, *Goldman v United States*, 316 US 129, 134-136[;

-4-

62 S Ct 993; 86 L Ed 2d 1322] (1942); *Olmstead v United States*, 277 US 438, 464-466[; 48 S Ct 564; 72 L Ed 2d 944] (1928).  Cf. *Silverman v United States*, supra, at 510-512 (technical trespass not necessary for Fourth Amendment violation; it suffices if there is "actual intrusion into a constitutionally protected area").  Visual surveillance was unquestionably lawful because " 'the eye cannot by the laws of England be guilty of a trespass.' " *Boyd v United States*, 116 US 616, 628[; 6 S Ct 524; 29 L Ed 746] (1886) (quoting *Entick v Carrington*, 19 How St Tr 1029, 95 Eng Rep 807 (K B 1765)).  We have since decoupled violation of a person's Fourth Amendment rights from trespassory violation of his property, see *Rakas v Illinois*, 439 US 128, 143[; 99 S Ct 421; 58 L Ed 2d 387] (1978), but the lawfulness of warrantless visual surveillance of a home has still been preserved.  As we observed in *California v Ciraolo*, 476 US 207, 213[; 106 S Ct 1809; 90 L Ed 2d 210] (1986), "[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares."

One might think that the new validating rationale would be that examining the portion of a house that is in plain public view, while it is a "search"[2] despite the absence of trespass, is not an "unreasonable" one under the Fourth Amendment. See *Minnesota v Carter*, 525 US 83, 104[; 119 S Ct 469; 142 L Ed 2d 373] (1998) (BREYER, J., concurring in judgment).  But in fact we have held that visual observation is no "search" at all—perhaps in order to preserve somewhat more intact our doctrine that warrantless searches are presumptively unconstitutional. See *Dow Chemical Co v United States*, 476 US 227, 234-235, 239[; 106 S Ct 1819; 90 L Ed 2d 226] (1986).  In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in *Katz v United States*, 389 US 347[; 88 S Ct 507; 19 L Ed 2d 576] (1967).  *Katz* involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth-a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches.  We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth. *Id.*, at 353. As Justice HARLAN's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.  See *id.*, at 361.  We have subsequently applied this principle to hold that a Fourth Amendment search does *not* occur—even when the explicitly protected location of a *house* is concerned—unless "the individual manifested a subjective expectation of privacy in the object of the challenged search," and "society [is] willing to recognize that expectation as reasonable." *Ciraolo*, *supra*, at 211.  We have applied this test in holding that it is

---

[2] When the Fourth Amendment was adopted, as now, to "search" meant "[t]o look over or through for the purpose of finding something; to explore; to examine by inspection; as, to *search* the house for a book; to *search* the wood for a thief."  N. Webster, An American Dictionary of the English Language 66 (1828) (reprint 6th ed. 1989).

not a search for the police to use a pen register at the phone company to determine what numbers were dialed in a private home, *Smith v Maryland*, 442 US 735, 743-744[; 99 S Ct 2577; 61 L Ed 2d] (1979), and we have applied the test on two different occasions in holding that aerial surveillance of private homes and surrounding areas does not constitute a search, *Ciraolo*, *supra*; *Florida v Riley*, 488 US 445[; 109 S Ct 693; 102 L Ed 2d 835] (1989).

The present case involves officers on a public street engaged in more than naked-eye surveillance of a home. We have previously reserved judgment as to how much technological enhancement of ordinary perception from such a vantage point, if any, is too much. While we upheld enhanced aerial photography of an industrial complex in *Dow Chemical*, we noted that we found "it important that this is not an area immediately adjacent to a private home, where privacy expectations are most heightened," 476 US, at 237, n. 4 (emphasis in original). [*Kyllo*, 533 US at 31-33.]

Although *Kyllo* addressed the use of a thermal imaging device on the defendant's home, it was noteworthy that the device could detect infrared radiation "not visible to the naked eye." *Kyllo*, 533 US at 29-30. The Court went on to observe that the advance of technology had "exposed to public view (and hence, we have said, to official observation) uncovered portions of the house and its curtilage that once were private." *Id*. at 34. The Court noted that outside the curtilage of a home, it might be "difficult to refine" the principle in *Katz* that individuals may have "an expectation of privacy that society is prepared to recognize as reasonable." *Id*. Thus, the reasonable expectation of privacy one might have in property outside the curtilage of one's home is less than the reasonable expectation of privacy one might have within one's home, but it is not nonexistent, nor does plaintiff advance such an argument. Indeed, a person may retain reasonable expectations of privacy even in public, because society historically expected that there were limits to what kind of surveillance could be feasibly performed by law enforcement agents or others. *Carpenter*, 585 US at ___; 138 S Ct at 2117 (slip op at p 12).

Critically for the instant matter, the Court opined that mere existence and availability of technological advancements should not be per se determinative of what privacy expectations society should continue to recognize as reasonable. *Kyllo*, 533 US at 33-35. Although again discussing only privacy within the home, the Court emphasized that the homeowner should not be "at the mercy of advancing technology" that might eventually be able to see directly through walls outright. *Id*. at 35-36. The development of historically-novel ways to conduct unprecedented levels of surveillance at trivial expense does not per se reduce what society and the law will recognize as a reasonable expectation of privacy. Carpenter, 585 US at ___; 138 S Ct at 1217-1219 (slip op at pp 12-15).

In *California v Ciraolo*, 475 US 207; 106 S Ct 1809; 90 L Ed 2d 210 (1986), the United States Supreme Court determined "whether the Fourth Amendment is violated by aerial observation without a warrant from an altitude of 1,000 feet of a fenced-in backyard within the curtilage of a home." In that case, a law enforcement officer used an airplane, flown at an altitude of 1,000 feet, to observe the respondent's yard, which was next to the respondent's home and enclosed by a fence. *Id*. The officer identified marijuana plants in the respondent's yard and used a camera to photograph the area, and the images were used to secure a warrant. *Id*. The respondent

moved to suppress the evidence of the search, and that motion was denied. *Id*. at 210. The United States Supreme Court rejected the respondent's argument that no governmental aerial observation of his yard was permissible without a warrant because the yard was in the curtilage of his home; the Court concluded that the respondent's expectation that his yard was protected from the officers' observation was objectively unreasonable. *Id*. at 212, 214. The Court determined that the officer's observations took place within public navigable airspace, in a physically nonintrusive matter, and that "[a]ny member of the public flying in [the] airspace who glanced down could have seen everything that these officers observed." *Id*. at 213-214. The United States Supreme Court concluded, "[i]n an age where private and commercial flight in the public airways is routine, it is unreasonable for respondent to expect that his marijuana plants were constitutionally protected from being observed with the naked eye from an altitude of 1,000 feet." *Id*. at 215.

Only a few years later, in *Florida v Riley*, 488 US 445; 109 S Ct 693; 102 L Ed 2d 835 (1989), the United States Supreme Court held, in a plurality opinion, that police observation of a greenhouse, located in respondent Riley's curtilage, from a helicopter at an altitude of 400 feet did not violate the Fourth Amendment. *Riley*, 488 US at 447-448, 452. Relying on *Ciraolo*, the plurality concluded that Riley "could not reasonably have expected that his greenhouse was protected from public or official observation from a helicopter had it been flying within the navigable airspace for fixed-wing aircraft." *Id*. at 449, 450-451. The plurality specifically noted that:

> We would have a different case if flying at that altitude had been contrary to law or regulation. But helicopters are not bound by the lower limits of the navigable airspace allowed to other aircraft. Any member of the public could legally have been flying over Riley's property in a helicopter at the altitude of 400 feet and could have observed Riley's greenhouse. [*Id*. at 451.]

The plurality stated that it was "of obvious importance that the helicopter in [the] case was not violating the law[.]" *Id*. Additionally, the plurality noted that the record did not reveal that there were any "intimate details connected with the use of the home or curtilage" observed and that "there was no undue noise, and no wind, dust, or threat of injury." *Id*. at 452.

Justice O'Connor concurred in the judgment, stating, "I agree that police observation of the greenhouse in Riley's curtilage from a helicopter passing at an altitude of 400 feet did not violate an expectation of privacy 'that society is prepared to recognize as "reasonable." ' " *Id*. at 452 (O'CONNOR, J., concurring) (citation omitted). However, Justice O'Connor opined that the plurality relied "too heavily on compliance with FAA regulations," and stated that compliance with FAA regulations alone does not determine compliance with the Fourth Amendment. *Id*. at 452, 453. Justice O'Connor explained that the relevant inquiry regarding whether Riley had a reasonable expectation of privacy was "whether the helicopter was in the public airways at an altitude at which members of the public travel with sufficient regularity that Riley's expectation of privacy from aerial observation was not 'one that society is prepared to recognize as "reasonable." ' " *Id*. at 454 (citation omitted). Justice O'Connor concluded, "Because there is reason to believe that there is considerable public use of airspace at altitudes of 400 feet and above, and because Riley introduced no evidence to the contrary before the Florida courts, I conclude that Riley's expectation that his curtilage was protected from naked-eye aerial observation from that altitude was not a reasonable one." *Id*. at 455. Although defendant argues that *Riley* is not binding

on this Court, Justice O'Connor concurred with majority on the limited ground that Riley did not have a reasonable privacy interest in the curtilage of his home that was observable, even from the air, by the naked-eye. Thus, a majority of the United States Supreme Court agreed that the respondent's expectation of privacy was unreasonable and the more limited holding is binding law.[3]

Also important to this case, however, are the two dissenting opinions in *Riley*, because the defendant in this case seeks to make violations of FAA regulations tantamount to violations of the Fourth Amendment. Four dissenting Justices agreed with Justice O'Connor that compliance with FAA regulations was not dispositive on the Fourth Amendment analysis. See *Riley*, 488 US at 464-465 (BRENNAN, J., dissenting) ("A majority of the Court thus agrees that the fundamental inquiry is not whether the police were where they had a right to be under FAA regulations, but rather whether Riley's expectation of privacy was rendered illusory by the extent of public observation of his backyard from aerial traffic at 400 feet."); *Riley*, 488 US at 467 (BLACKMUN, J., dissenting) ("Like Justice Brennan, Justice Marshall, Justice Stevens, and Justice O'Connor, I believe that answering this question . . . does not depend upon the fact that the helicopter was flying at a lawful altitude under FAA regulations. A majority of this Court thus agrees to at least this much."). Therefore, the trial court correctly determined that noncompliance with FAA regulations does not, per se, establish that a Fourth Amendment violation occurred.

## IV. ANALYSIS

As defendants tacitly concede, *Ciraolo* and *Riley* establish that defendants could not have reasonably expected the activities and items on their property to be protected from public or official observation made by a human being from the publicly navigable airspace. Conversely, unrefuted photographic exhibits of defendants' property taken from the ground seem to establish a reasonable expectation of privacy against at least casual observation from a non-aerial vantage point. We conclude that; much like the infrared imaging device discussed in *Kyllo*; low-altitude, unmanned, specifically-targeted drone surveillance of a private individual's property is qualitatively different from the kinds of human-operated aircraft overflights permitted by *Ciraolo* and *Riley*. We conclude that drone surveillance of this nature intrudes into persons' reasonable expectations of privacy, so such surveillance implicates the Fourth Amendment and is illegal without a warrant or a traditional exception to the warrant requirement.[4]

---

[3] "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .' " *Marks v United States*, 430 US 188, 193; 97 S Ct 990; 51 L Ed 2d 260 (1977) (ellipsis in original; citation omitted).

[4] We note, for example, that consent is an exception to the warrant requirement. See *People v Jordan*, 187 Mich App 582, 587; 468 NW2d 294 (1991). Thus, the parties could have included some kind of inspection provision in their settlement agreement that would have obviated the issues in this appeal.

Although noncompliance with FAA regulations does not establish a Fourth Amendment violation, such regulations are relevant to what a person might reasonably expect to occur overhead. Persons may, absent extraordinary circumstances, reasonably expect the law to be followed, even if they know the law is readily capable of being violated. See *Camden Fire Ins Co v Kaminski*, 352 Mich 507, 511; 90 NW2d 685 (1958); *People v Stone*, 463 Mich 558, 565-567; 621 NW2d 702 (2001). The FAA regulations, 14 CFR part 107,[5] require drone operators to keep drones within visual observation at all times, fly drones no higher than 400 feet, refrain from flying drones over human beings, and obtain a certification. Such rules reflect the fact that drones are qualitatively different from airplanes and helicopters: they are vastly smaller and operate within little more than a football field's distance from the ground. A drone is therefore necessarily more intrusive into a person's private space than would be an airplane overflight. Furthermore, unlike airplanes, which routinely fly overhead for purposes unrelated to intentionally-targeted surveillance, drone overflights are not as commonplace, as inadvertent, or as costly. In other words, drones are intrinsically more targeted in nature than airplanes and intrinsically much easier to deploy. Furthermore, given their maneuverability, speed, and stealth, drones are—like thermal imaging devices—capable of drastically exceeding the kind of human limitations that would have been expected by the Framers not just in degree, but in kind.

Although the United States Supreme Court rejected the ancient understanding that land ownership extended upwards forever, landowners are still entitled to ownership of some airspace above their properties, such that intrusions into that airspace will constitute a trespass no different from an intrusion upon the land itself. *United States v Causby*, 328 US 256, 260-265; 66 S Ct 1062; 90 L Ed 1206 (1946). Drones fly below what is usually considered public or navigable airspace. Consequently, flying them at legal altitudes over another person's property without permission or a warrant would reasonably be expected to constitute a trespass. We do not decide whether nonpermissive drone overflights necessarily *are* trespassory, because we need not decide that issue. Although a physical trespass by a governmental entity may constitute a violation of the Fourth Amendment, a trespass into an open field[6] might not implicate the Fourth Amendment. See *United States v Jones*, 565 US 400, 404-411; 132 S Ct 945; 181 L Ed 2d 911 (2012). Furthermore, we think there is little meaningful distinction for present purposes between" just inside the property line" and "just outside the property line." We decide this matter based upon defendants' reasonable expectation of privacy—critical to which is that any reasonable person would have *expected* a low-altitude drone overflight to be trespassory and exceptional, whether the drone flew as high as a football-field length or flew directly up to an open bathroom window. The Legislature has already stated that drones may not be used to violate a reasonable expectation of privacy, MCL 259.322(3), or to perform an act that would be illegal if performed by the operator in person, MCL 259.320(1).

The Fourth Amendment requires persons both to establish a legitimate expectation of privacy and to establish that society is prepared to recognize that expectation as reasonable. *People v Mead*, 503 Mich at 212-213. As noted, just because it is well-known that a particular intrusion

---

[5] See FAA fact sheet: < https://www.faa.gov/news/fact_sheets/news_story.cfm?newsId=22615 >.

[6] We observe, however, that defendants' property can hardly be described as an "open field" by any lay understanding of the term, and as noted, most of it is not visible from the ground.

into privacy is technologically feasible does not cause a person's reasonable expectation of privacy to evaporate. *Stone*, 463 Mich at 562-567.[7] The United States Supreme Court has, likewise, held that just because technology develops new and innovative ways in which a person's privacy *can* be violated must not dictate whether that person retains a legitimate expectation of privacy and whether society should continue to recognize that expectation as reasonable. *Kyllo*, 533 US at 33-36. Implicit in both *Stone* and *Kyllo* is that there would have historically been an expectation of privacy that becomes called into question solely by a change in the available technology—which is clearly the situation here. See also *Carpenter*, 585 US at ___; 138 S Ct at 2213-2217 (slip op at pp 5-12). We believe it would be unworkable and futile to try to craft a precise altitude test. Rather, we conclude that persons have a reasonable expectation of privacy in their property against drone surveillance, and therefore a governmental entity seeking to conduct drone surveillance must obtain a warrant or satisfy a traditional exception to the warrant requirement.

We also observe that plaintiff's warrantless surveillance was totally unnecessary. The parties could easily have—and likely should have—included a monitoring or inspection provision in their settlement agreement. Aside from that, as the United States Supreme Court observed, the quantum of evidence necessary to establish probable cause to conduct an administrative inspection is more than "none," but is less than what might be required to execute a criminal search warrant. *Camara*, 387 US 528-539. By plaintiff's own account, it had concrete evidence, in the form of unrelated site inspection photographs and complaints from defendants' neighbors, that defendants were violating the settlement agreement, violating the zoning ordinance, and creating a nuisance. Our holding today is highly unlikely to preclude any legitimate governmental inspection or enforcement action short of outright "fishing expeditions." If a governmental entity has any kind of nontrivial and objective reason to believe there would be value in flying a drone over a person's property, as did plaintiff here, then we trust the entity will probably be able to persuade a court to grant a warrant or equivalent permission to conduct a search.

## V. CONCLUSION

We reverse the trial court's May 16, 2019 order denying defendants' motion to suppress evidence, and we remand for entry of an order suppressing all photographs taken of defendants' property from a drone and for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Kathleen Jansen
/s/ Amy Ronayne Krause

---

[7] Although our Supreme Court's analysis in *Stone* was based on Michigan's eavesdropping statutes, we think its reasoning is equally applicable here.